SHIRLEY SEARS, Plaintiff-Appellee, *v.* JULIE RUTISHAUSER, Defendant-Appellant.

Fourth District   No. 4—82—0743

Opinion filed June 13, 1983.—Modified on denial of rehearing September 14, 1983.

WEBBER, P.J., concurring in part and dissenting in part.

Costigan & Wollrab, of Bloomington, for appellants.

Jerome Mirza & Associates, Ltd., of Bloomington (David V. Dorris and Randall A. Mead, of counsel), for appellee.

JUSTICE GREEN delivered the opinion of the court:

On August 9, 1977, the plaintiff, Shirley Sears, filed a complaint in the circuit court of McLean County alleging that (1) the defendant, Julie Rutishauser, negligently operated her automobile, and (2) as a direct and proximate cause of the defendant's negligent acts the plaintiff sustained permanent personal injuries. Following a jury trial, the trial court entered a judgment against the defendant on June 24, 1982, awarding the plaintiff $40,000 in damages. The defendant appeals. We affirm.

On appeal, the defendant maintains that (1) the trial court erred in refusing to allow the defendant to cross-examine one of the plaintiff's treating physicians about the number and frequency of patient referrals which that physician had received from plaintiff's counsel, (2) the trial court erred in allowing plaintiff to introduce into evidence certain cross-examination testimony which allegedly was beyond the scope of the defendant's direct examination, and (3) the closing rebuttal argument of plaintiff's counsel was so prejudicial as to deny the defendant her right to a fair trial.

Because no question is raised concerning the sufficiency of proof, we discuss the evidence only briefly. The plaintiff testified at trial that at approximately 8:15 a.m. on February 14, 1977, she was proceeding eastbound on Vernon Avenue, a four-lane street in Normal. Noting that the roads were slippery because of a recent snowfall, the plaintiff drove in the lane next to the curb at a speed of approximately 15 miles per hour. Immediately prior to the accident, the plaintiff observed the defendant's vehicle traveling westbound on Vernon Avenue and estimated its speed at 40 miles per hour. As the defendant's vehicle drew near it went into a skid, spun around into the eastbound lane, and the right rear portion of the defendant's vehicle struck the left fender and hood of the plaintiff's vehicle while both vehicles were still moving.

The defendant's testimony concerning the circumstances surrounding the accident was substantially similar to that of the plaintiff. However, the defendant did state that after her vehicle hit a patch of ice, crossed the center line and came to rest against the south curb of Vernon Avenue, she had been stopped for less than five seconds when plaintiff's vehicle struck the rear of defendant's vehicle. The defendant also stated that she had been traveling at a rate of 25 miles per hour immediately before she encountered the patch of ice.

The plaintiff testified that following the accident she developed pain and stiffness in her neck and in the right top portion of her body. As to her symptoms at the time of trial, the plaintiff stated that (1) her right hand and arm felt as though they were asleep and she had a loss of strength in that arm, and (2) she was unable to raise her right hand or arm above her head and her neck was stiff and painful.

During the approximately five-year period between the automobile accident and the jury trial, the plaintiff was treated by various doctors. At trial, the plaintiff relied primarily on the testimony of three of those doctors. Dr. John Wright testified that, in his opinion, the plaintiff had an acute cervical strain with contractures and disuse changes caused by the automobile accident. In his evidence deposition, Dr. Hugh McMenamin stated that the plaintiff had cervical radiculitis and shoulder encapsulitis, or frozen shoulder. Dr. Donald Rumer, the plaintiff's treating physician at the time of the trial, stated that (1) the plaintiff had thoracic outlet syndrome, and (2) the plaintiff's permanent injuries were among the worst he had ever treated.

The defendant introduced the testimony of Dr. Rieber Hovde, the plaintiff's family doctor at the time of the accident. Dr. Hovde testified that (1) the plaintiff had osteoarthritis which had existed prior to the automobile accident, (2) her injuries resulting from the accident were minor, (3) she had only a slight loss of motion in her neck which was both psychological and physiological in nature, and (4) she did not have thoracic outlet syndrome.

Prior to trial, the defendant filed a motion *in limine* requesting that the trial court prohibit the plaintiff from offering the testimony of Dr. Rumer, unless the doctor personally appeared at trial and produced the files of all the patients he had treated in the preceding four years on referral from attorney Jerome Mirza. Although Mr. Mirza was not trial counsel, his firm was representing plaintiff. During a hearing on this motion, the defendant argued that she should be allowed to introduce evidence concerning the number and frequency of client referrals from Mr. Mirza to Dr. Rumer in order to question Dr. Rumer's credibility by showing bias and interest on his part in testifying for the plaintiff, who had also been referred to Dr. Rumer by Mr. Mirza. Relying on the case of *Davis v. Gulf, Mobile & Ohio R.R. Co.* (1971), 130 Ill. App. 2d 988, 272 N.E.2d 240, the trial court determined that Dr. Rumer could be asked whether he had received other referrals from Mr. Mirza, but he could not be asked about the number or frequency of those referrals.

The defendant argues that the trial court erred in refusing to allow Dr. Rumer to be cross-examined concerning the number and fre-

quency of patient referrals which he had received from Mr. Mirza. The defendant points out that (1) the plaintiff's expert, Dr. Rumer, and the defendant's expert, Dr. Hovde, disagreed as to the cause and extent of the plaintiff's injuries, and (2) this conflict between the experts made the credibility of Dr. Rumer and Dr. Hovde an important consideration.

The *Davis* case is the only Illinois case dealing with the issue of whether a party's treating physician may be cross-examined concerning the frequency of referrals he has received from the party's counsel. Although the final form of the *Davis* opinion is disputed, the court clearly held that no error resulted merely because the trial court permitted such cross-examination. The court indicated that whether to permit the cross-examination was a matter of discretion for the trial court. Analogy was drawn to *McMahon v. Chicago City Ry. Co.* (1909), 239 Ill. 334, 88 N.E. 223, where the court held that a similar discretion existed concerning the frequency with which a physician had testified for the various street car lines of Chicago. In *McMahon*, the trial court had exercised its discretion by allowing the cross-examination. Courts in other States have held that allowance of cross-examination of a physician as to the frequency of referrals to him by the opposing party's counsel was not error. See *Wilson v. Stilwill* (1981), 411 Mich. 587, 309 N.W.2d 898, and *Ager v. Baltimore Transit Co.* (1957), 213 Md. 414, 132 A.2d 469.

We also note that Professors Cleary and Graham state in section 705.2 of their treatise that:

"Inquiry into compensation [of expert witnesses] is a matter of right. [Citation.] Prior employment by the same party may be brought out [*McMahon*], as well as referrals from the same attorney [*Davis*]; but refusal to permit questions as to a consistent pattern of testifying for parties with similar interests in other cases has been sustained. *Chicago & Eastern Illinois R.R. Co. v. Schmitz* (1904), 211 Ill. 446, 71 N.E. 1050. In the latter situation, if the showing is sufficient to cast substantial doubt on the good faith and integrity of the witness, the inquiry would seem in principle to be allowable within the discretion of the trial judge, despite the risk of collateral issues." E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 705.2, at 385 (3d ed. 1979).

We conclude that the issue of whether to allow cross-examination of an expert medical witness concerning the frequency of his patient referrals from a party's attorney is within the discretion of the trial court. However, in this case, the issue involves matters collateral to

the question of the extent of the party's injury. Here, defendant's offer of proof indicated that Dr. Rumer was uncertain as to the frequency of the referrals. Defense counsel's request for Dr. Rumer's records indicated that lengthy questioning might be necessary if the matter was pursued. The trial court seemed to be under the impression that because of the precedent of *Davis* it "probably" could not properly permit the cross-examination. However, the court's remarks permit the inference that it would not have permitted the cross-examination even if it had discretion. The court's ruling was not error.

The defendant's next contention concerns the introduction of Dr. Hugh McMenamin's testimony which was relied upon by the plaintiff at trial. This testimony consisted of portions of Dr. McMenamin's cross-examination by plaintiff during an evidence deposition taken by defendant. The defendant maintains that (1) this cross-examination exceeded the scope of the direct examination conducted by defense counsel in taking the evidence deposition, and (2) the procedure used allowed the plaintiff to present Dr. McMenamin's entire course of treatment of the plaintiff through the use of leading questions.

Defense counsel's direct examination of Dr. McMenamin, which dealt primarily with his opinion concerning the use of two drugs prescribed by Dr. Rumer for the plaintiff, included the following questions:

"Q. Did you feel that when you saw this woman and treated her that there would be any guarantee that this particular drug of Prednisone would give any significant relief to her?"

"Q. Now, as far as Prednisone, would you use that in reference to the treatment of a woman with the complaints that she told you about?"

"Q. Isn't it true that unless you are absolutely up against the wall, that you wouldn't use Butazolidin in reference to your treatment of this woman?"

The scope of cross-examination is an issue which lies largely within the discretion of the trial court. (*Biel v. Wolff* (1970), 126 Ill. App. 2d 209, 261 N.E.2d 474.) In propounding the foregoing questions to Dr. McMenamin, defense counsel was delving into the treatment prescribed by Dr. McMenamin for the plaintiff. The trial court did not abuse its discretion in ruling that the plaintiff's cross-examination of Dr. McMenamin concerning the details of that treatment did not exceed the scope of the direct examination.

Finally, we consider defendant's assertion that plaintiff's rebuttal closing argument was so prejudicial as to deny her a fair trial. Plaintiff's counsel said defense counsel had "just plain misstated" certain

matters, that doing so was "inexcusable," and that the number of times he had done so was such that "it could not have been unintentional." Plaintiff's counsel also asserted that defense counsel (1) stated things that were inaccurate, (2) "twisted" things in a way which "just [was not] true," (3) threw "mud," (4) did not tell the truth in summarizing the testimony of a physician, and (5) insulted the jury by changing the testimony as often as he did. Near the conclusion of his argument, plaintiff's counsel stated:

"I am depending on the twelve of you to have remembered that testimony and not let this man get away with changing that testimony in closing argument."

Defendant argues that the foregoing comments (1) made a direct appeal to the passion and prejudice of the jury, (2) branded defense counsel as a liar, (3) told the jury that the lies were an insult to them, and (4) requested the jury to punish defendant for these lies. In support of these contentions the defendant relies primarily on *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 381 N.E.2d 383, *Cecil v. Gibson* (1976), 37 Ill. App. 3d 710, 346 N.E.2d 448, and *Paulsen v. Gateway Transportation Co.* (1969), 114 Ill. App. 2d 241, 252 N.E.2d 406.

In *Manninger*, plaintiff's counsel during his closing argument asserted that defense counsel had prepared the testimony for the defense witnesses and told them what to say in order to defeat plaintiff's claim. The appellate court concluded that this closing argument accused defense counsel of subornation of perjury and suppression and distortion of evidence and deprived the defendant of a fair trial.

In *Cecil*, defense counsel in his closing argument referred to plaintiffs' counsel as a "slick attorney from Chicago" and a "slick hired-hand" and claimed that plaintiffs' counsel "manufactured" evidence, had a "wild imagination," and was not worthy of the jury's trust. (*Cecil v. Gibson* (1976), 37 Ill. App. 3d 710, 711, 346 N.E.2d 448, 449.) The appellate court determined that defense counsel's closing argument was grossly prejudicial and denied the plaintiffs their right to a fair trial.

In *Paulsen*, plaintiff's counsel during his closing argument referred to defense counsel as "this man who plays fast and loose with the facts in this case." Plaintiff's counsel also stated:

" '[Defense counsel] is trying to change the facts by trickery, he is trying to change the situation, he is trying to color the facts, to distort the facts and take them out of context.

But I'm up to his gimmicks, I'm up to his tricks.' " (*Paulsen v. Gateway Transportation Co.* (1969), 114 Ill. App. 2d 241,

245, 252 N.E.2d 406, 408.)

The *Paulsen* court condemned these remarks and others as having no application to the factual issues of the case and reversed the judgment for the plaintiff. The court stated that the argument was "an unwarranted characterization of defendant's counsel and a successful effort to belittle, impugn and ridicule him and thus deprive the defendant of fair treatment by the jury." 114 Ill. App. 2d 241, 247, 252 N.E.2d 406, 409.

Plaintiff's counsel in *Paulsen* also accused defense counsel of torturing the plaintiff by asking her if she should have a myelogram and stated that the defendant had put her in the hospital by its negligent conduct and then wanted to " '*** subject her to this horrifying, terrible ordeal of another jab with the needle into her back ***.' " 114 Ill. App. 2d 241, 246, 252 N.E.2d 406, 409.

Here, unlike in *Manninger* and *Cecil,* plaintiff's argument contained no accusations of perjury, suppression of evidence, or creation of "manufactured" evidence. This case is more like *Paulsen* in that the argument complained of the accuracy with which opposing counsel recited the evidence and stated that opposing counsel had misstated the evidence intentionally. However, here plaintiff's counsel did not accuse the defense of wishing to torture the plaintiff.

Counsel may, of course, dispute the accuracy of opposing counsel's interpretation of the evidence and may also comment upon the extent of the inaccuracies. No exact line can be drawn as to how far, beyond that point, one's argument may go in criticizing opposing counsel's accuracy. In the heat of trial where each counsel has ridiculed the other's argument, accusations are often made which would have been better left unsaid. Such was the case here when plaintiff's counsel stated that defense counsel "did not tell the truth" and made other comments implying that he had lied. However, considering the vigorous nature of the arguments on both sides and the fact that the size of the verdict did not indicate prejudice against defendant, we hold that plaintiff's argument did not deprive defendant of a fair trial. We need not consider whether defendant waived error in plaintiff's argument by failing to object or to demand rulings on the objections that were made. No reversible error occurred.

For the foregoing reasons we affirm the judgment entered by the circuit court of McLean County.

Affirmed.

MILLS, J., concurs.

PRESIDING JUSTICE WEBBER, concurring in part and dissenting in part:

I agree with my learned colleagues that no error occurred in the treatment of Dr. McMenamin's testimony; however, I differ seriously with them on the matters concerning the cross-examination of Dr. Rumer and the rebuttal argument of plaintiff's counsel.

The handling of expert witnesses and their cross-examination may be summed up in the old adage, "Whose bread I eat, his song I sing." One need only scan the professional journals to observe that experts are for hire in the market place on an almost illimitable number of "specialities." In this era of complex technology and with a litigation explosion of geometric proportions, especially in the fields of products liability and malpractice, these persons are essential for the jury's understanding of the subject matter of lawsuits. However, the corollary to this proposition is that they are hired partisans and in judging their testimony the jury is entitled to know whence they came. This is especially true when, as in the instant case, the duel of the experts is one-on-one. It would be a rare case today when the expert witness is the saintly country doctor or the kindly county surveyor, known to the whole community including the jury.

It then follows that the widest latitude should be allowed in presenting anything, including relationships with the parties or their counsel, which might affect the credibility of the witness.

I do not read *Davis* with quite the same aplomb as does the majority. A close inspection of that opinion reveals that much of what was said in it was irrelevant to the precise problem presented. Moreover, the text as set forth in the official reports (*Davis v. Gulf, Mobile & Ohio R.R. Co.* (1971), 130 Ill. App. 2d 988) is not the final one. The records in the office of the Clerk of the Fifth Appellate District show that the opinion was revised upon denial of rehearing and the revised opinion was filed June 22, 1971. The final version is correctly reported at 272 N.E.2d 240.

In *Davis* the defendant in cross-examination sought to undermine the credibility of a medical witness by showing that he had referrals from plaintiff's counsel. Ten individuals were apparently mentioned who either had had, or then had, suits against railroads and were represented by plaintiff's counsel. In eight of the 10 the doctor remembered the patient or the patient's name but did not know who had referred him, and in two cases did not remember the patient. In only one case out of seven did the doctor remember testifying against a railroad. In this state of the record "both counsel made reference to the fact that plaintiff's attorney had sent the plaintiff to consult Dr.

Deyton. *There was no testimony of the witnesses to support this statement of both counsel."* (Emphasis added.) (272 N.E.2d 240, 243.) "Defendant offered no evidence to support the inference of bias which the specific inquiries raised by suggestion of counsel that each had been referred by plaintiff's counsel." 272 N.E.2d 240, 243-44.

In lieu of headnote 1 in the Official Reports (130 Ill. App. 2d 988, 992) the following appears at 272 N.E.2d 240, 244-45:

"In the present case the Doctor was not asked whether he testified only for plaintiffs on cross-examination, but stated that he had received referrals from plaintiffs' counsel but could not state how many nor whether they could be described as frequent. The Doctor's admission that he had received referrals from plaintiffs' counsel raised an inference of bias, and it was the Doctor's subsequent evasive answers concerning the frequency that allowed the court to exercise its discretion as to whether specific cases should be shown in this particular case. However, the evidence elicited did not support the suggestions that any of the 10 individual cases had been referred by plaintiff's counsel, and defendant offered no evidence that any of those 10 had been referred by plaintiff's counsel. In Chicago City Ry. Co. v. Smith, 226 Ill. 178 at page 187, 80 N.E. 716, at page 720, the Court stated:

'Conceding appellants right of cross-examination to discover the motives, feelings and prejudices of a witness, still we are not inclined to hold that there was any error committed in refusing to allow the cross-examination to be extended to other cases having no connection with the case then being tried.'

In C. & E. I. Railroad v. Schmitz, 211 Ill. 446, 72 N.E. 150, the Court stated:

'It was also sought by the Appellants to show by direct examination of certain witnesses that the physician in question was interested as a medical man in a large number of personal injury suits against corporations. This class of testimony the trial court refused to admit. Cross-examination upon independent cases of the same character, and about the same time as the principal case, is not allowed.'

From the authorities cited herein, we conclude that under ordinary circumstances, having shown the relationship between the Doctor and plaintiff's counsel there is no proper basis for going into specific cases, and to do so would be reversible error, however, under the circumstances here present, permitting interrogation with respect to specific cases without the defendant

then offering evidence of the relationship in those specific cases was error, but under the circumstances here present, not reversible error."

From these excerpts it is apparent that the real problem in *Davis* was not the legitimacy of the cross-examination which produced nothing of value, but the fact that argument was made based on assumptions not established in the record.

The problem in the instant case is that defendant was prevented by the trial court from making a record. Prior to trial, the defendant filed a motion *in limine* requesting that the trial court prohibit the plaintiff from offering the testimony of Dr. Rumer, unless the doctor personally appeared at trial and produced the files of all the patients he had treated in the preceding four years on referral from plaintiff's attorney. During a hearing on this motion, the defendant argued that she should be allowed to introduce evidence concerning the number and frequency of client referrals to Dr. Rumer in order to question Dr. Rumer's credibility and show bias and interest on his part in testifying for the plaintiff who had also been referred to Dr. Rumer by her counsel. The defendant noted that Dr. Rumer would not be asked to disclose the names of his other patients or identify them in any way, but that the files were necessary for cross-examination about the frequency and number of referrals from plaintiff's counsel.

The court granted the defendant's motion *in limine* in part and denied it in part. The trial court ruled that because of a prior stipulation between the parties, Dr. Rumer had to testify in person rather than by evidence deposition. However, the trial court refused to require the doctor to produce records of other patients who had been referred to him by Mr. Mirza. In the opinion of the court, the doctor could be asked whether he had received other referrals from plaintiff's attorney but he would not be asked about the number or frequency of those referrals.

Defendant was thus denied an opportunity to lay the foundation for showing the bias of Dr. Rumer. The motion was renewed at the close of Rumer's direct examination and again denied by the trial court, relying on *Davis*. As an offer of proof, defendant was compelled to use a deposition made by Rumer who was singularly evasive on the subject.

In my judgment *Davis* does not stand for the proposition that inquiry is forfended into a relationship between an expert witness and counsel; it stands only for the familiar doctrine that matters not in evidence cannot be argued to the jury. The *Davis* court appeared distracted in its gratuitous discussion of the former.

The older authorities cited in *Davis, i.e., Handy, McMahon, Plam-*

*beck*, belong to an earlier, simpler age. They need reexamination. In my judgment the Michigan and Maryland cases mentioned in the principal opinion, *Wilson* and *Ager*, together with the statement of Cleary & Graham, indicate the modern rule. In *Wilson* it is said:

> "An expert witness's experience testifying in court may influence the manner in which he or she testifies. The same is true for experience in evaluating cases which may come to court. It is thus proper to bring out on cross-examination the number of times a witness testifies in court, or is involved in particular types of cases.
>
> * * *
>
> A showing of a pattern of testimony for a particular attorney in past cases raises a possible inference that the witness has testified in such a manner that he would be hired in future cases." 411 Mich. 587, 599-600, 309 N.W.2d 898, 902.

To the same effect is a statement by the *Ager* court:

> "This Court has held on many occasions that evidence tending to establish possible interest, bias or prejudice on the part of a witness is admissible as an aid in testing the weight and credit to be afforded his testimony. A situation, almost identical to the one in this case, arose in the Supreme Court of Missouri in the case of Lammert v. Wells, 321 Mo. 952, 13 S.W.2d 547. That Court held that the evidence tended to show the relation existing between the witness and the attorney, and was proper for the consideration of the jury as showing possible interest or bias." 213 Md. 414, 427-28, 132 A.2d 469, 476-77.

In my judgment the proper rule is that while some discretion must be left with the trial court in order to prevent abuse, that discretion is limited. The question should never be settled on a motion *in limine*. If doubt exists, an offer of proof should be taken from the witness himself. If the party seeking to impugn the testimony of the expert makes a *prima facie* showing of the relationship, he should then be permitted to present the matter to the jury under the usual and normal rules of cross-examination. The fact that this might be lengthy is no reason for denying the party his opportunity to attack the credibility of the expert. It is just one of the facts of modern legal life.

The trial court in this case was in error on this issue and I would reverse for a new trial on that basis alone.

As to the rebuttal argument, it is true that it did not rise to the level of the invective hurled by John Randolph against Henry Clay, "So brilliant, yet so corrupt, which, like a rotten mackerel by moon-

light, shines and stinks." Nonetheless, in my judgment it exceeded the bounds of propriety. If there is a dispute over the meaning of evidence or inferences to be drawn therefrom, that can be so stated without subtly, or otherwise, vilifying opposing counsel. Such conduct belongs to the days when court was a form of theater and I hope that those days died with the Scopes trial.

I would reverse and remand for a new trial.